All right, we have Mr. Bragg and Mr. Hudson on. Can you hear us? Yes, your honor. Mr. Hudson, can you hear me? Yes, I can. I can hear your honor now. Thank you. All right, we'll proceed in this case. And Mr. Bragg, you can begin. Thank you, your honor. Good morning and may it please the court. I'm Mike Bragg. I represent Devon Coleman, who was convicted on charges as described in their brief. And we're here regarding whether Judge Jones erred by failing to grant our motion to suppress the results of a search that arose on September 20th, 2017. It involves a, essentially a cherry stalk of Mr. Coleman's vehicle. On the morning of September 20th, 2017, the assistant or vice principal of Patrick Henry High School in Washington County, Virginia, as people were coming, beginning to appear for school, noticed a vehicle in the parking lot of the school. He checked on it and there he noted that there was someone, an adult, asleep in that car and also noted that there was a crossbow in the backseat. He was unable to waken the person in the car. And through that, he contacted, through the sheriff's office, Deputy Cody Johnson, the school resource officer who regularly is assigned to Patrick Henry High School, was off that day. Deputy Johnson was a school resource officer assigned to another school. He was at the other school and it took him some 15 minutes or so to drive to Patrick Henry High School. When he arrived, and I think he had contact with the vice principal, he observed an older model Pontiac Sunbird sitting partly in a parking space and partly in a travel area. The brake lights were on. He stopped behind it some distance away. And as he started to get out of his car, the Sunbird started driving away. Deputy Johnson then got into his car and at least turned on his lights. May have also, it sounded this siren just in the blast. The car immediately stopped. He encountered... Let me interrupt you there. At that point, that's the stop that's at issue, right? That's the Terry stop. That is. All right. So we don't really need to know what happened after that. Basically, the question is, was that stop supported by Terry? That is correct. With the evidence that was presented? That is correct. Ultimately, Judge Jones found that there was no... ...of a crime that was being committed to justify the stop. But Judge Jones found that the deputy's action was reasonable and therefore not in violation of the Constitution upon a mistaken belief that the... ...he was informed, the deputy had been informed that a crossbow was in the car. Mr. Bragg, if I could ask you at that juncture, I'm not sure I agree with your characterization of Judge Jones's findings. He obviously did center at one point on the crossbow, but he recited basically all the evidence that you've recited. So if we put the crossbow to the side and leave it out of the calculation for a moment, we have a circumstance where unfortunately now in our country, school grounds are in a different context than if it's the side of the road or the convenience store parking lot. So the officer arrives early morning, the students and faculty are arriving. It's clear that the defendant is not a student. The principal of the school has told him, we've been trying, we can't wake the guy up. I've seen the video. He was not parked in a parking place. He was just kind of sideways in the parking lot. Why wouldn't that, a passed out individual who has no apparent reason to be on school grounds at that time of the morning, justify a stop in and of itself, regardless of the crossbow? Your Honor, first, I would say that I do not believe that the record supports the conclusion that it was clear that the person in the car was clearly not a student. Well, he wasn't known to the principal. And when the police officer saw the gentleman, it was clear to him that he was an adult that wasn't a student. You can hear him say that in the video. I could amend, just a minute, I could amend Judge Agee's question with a material addition, and that is you can consider the crossbow. You just don't need to consider that it violated any law. But now you have a person with a lethal crossbow in the car. He apparently is not a student. He's parked erratically. The students are coming to school at that point. And the principal thought it was sufficiently suspicious to call the police. And the police tried to stop him and he moved. At that point, there's plenty of suspicion, especially with the crossbow, there is a lethal weapon. Everybody agrees it was a lethal weapon. And the risk was, of course, that children could get harmed. Tell me what is your understanding of the facts in terms? And my point in response to Judge Agee's question, and it may be a fine point, but I think it's a significant point. As your honor observed, the stop was when the moment of the stop is what is significant. So what information did the deputy have? I do not believe the deputy had, in terms of his information, at that point, that it clearly was not a student. That was my point there. Is this a middle school? It is a high school. High school. It is a high school. And are children, is there anything in the record about children having automobiles and parking on the school grounds? As I remember, yes. And actually, you can see in the, I believe, in the videos that this was an area of general parking where at least students, any adults or parents that were coming to school for whatever reason to conduct business also would park in that area. Would you like to show how old this man was? He was in his 30s, your honor. But that was not information. Why isn't that an adult? Yes, he was an adult. I'm saying that that was not information that the deputy had at the time. Oh, he observed the man. He observed the 30-year-old, and he doesn't have to know the precise age. He just knows he's an adult. He had not observed him to make that observation until after the stop. Well, let's set that aside. Here we have a car. The officer comes upon a car that's parked askew with the engine running a man and he has a crossbow and the children are coming to school. And the principal is alarmed by this to call the police. Now, why isn't that much more serious than the conduct observed in Terry, which was not criminal either? I'm assuming this is not criminal because you argue that it wasn't a crime. That's fair enough. But that doesn't eliminate the crossbow. The crossbow is still there and the crossbow is still a lethal weapon that can kill children or hurt children. So my question is, why isn't this much more egregious than the facts in Terry? You remember the facts in Terry? It's been a while to look at the way. Let me refresh your memory. There were three men on the sidewalk, walking back and forth, a public sidewalk, walking back and forth in front of a store. And they would look about and then they'll look in the window and then look back and forth and then look about. An officer observed this conduct and concluded, based on his experience, that these people were casing the store in order to rob it. And and they were not committing a crime at that point. He and the Supreme Court said that was a reasonable suspicion to stop and the officer could allay his concerns. So my suggestion here is this is much more extraordinary where you have a man sleeping with a crossbow in a school parking lot, a park somewhat askew. Can't the officer ask what's going on? It's highly suspicious, isn't it? Your Honor, and my response would be this. The reasonable suspicion that is required to justify the stop is that he had a reasonable suspicion that criminal activity was afoot. Therefore, in Terry, he could. But Terry explained criminal activity as afoot is either he's committing the crime or the officer is preventing the crime. Exactly. All right. So here we let's put it in the category of preventing. So what reasonable suspicion of what crime would he have at that point? Now, I want back up. Children, I just suggest pretty quickly injuring children. That's the principal's concern. He's looking after the welfare of the children coming to school. The. I will make this distinction. I believe from looking at the testimony of Deputy Johnson. He was responding to the call and his intention as he approached it was essentially making a wealth welfare check. Had he approached the car, it was still sitting there as it had been in the morning. Mr. Coleman was still asleep in the car and approaching the car and then taking whatever action was appropriate in terms of that interaction. Waking him up or however would have been totally appropriate and totally within the law. When he at the time of this interaction, however. Mr. Coleman plainly was still not was not still sleep. And he was driving away. So he was leaving the parking lot. He was. What about that, counsel? I mean, doesn't that add to the reasonable suspicion when you know, when he's approached by an officer, he drives away. I mean, I don't think that would be enough in and of itself. But that adds to it, doesn't it? It could under different circumstances. But the circumstances that were here was not someone running away from the officer. Well, he was he was there by himself and not running away until he observed an officer getting out of the car. Isn't that right? As the officer. I'm sorry. I didn't mean to interrupt you. No, no, that's OK. As the officer pulled up, his brake light was on. In other words, he either was putting his car into a drive to pull away or it was already in drive to drive away. And he had and he was holding the car with the brake light with the brakes on. So it's not that he drove away in response. He was in the process of driving away as the officer arose. It was so at that point there was nothing in terms of intervening to. Well, let me ask you what what is an adult in a high school parking lot doing with a lethal weapon? That's a crossbow. In southwest Virginia, it is not unusual for someone to have a crossbow intervene. It's not unusual for somebody to have a gun either. I'm talking about a man parked in a school parking lot with a crossbow. The why one would have it. That's not why I'm not asking. I'm trying to suggest it is. It is unusual in the context of a school parking lot. I have to have a man sleeping with a crossbow in the back of the vehicle parked askew. I mean, you argue that that doesn't violate any crime and I go along with you on that. You don't need to get to that. You just need to take the facts and say, does it raise a reasonable suspicion? Objectively reasonable suspicion. And these are the this is the dialogue we're having. And I gather you're suggesting that these facts did not raise a reasonable suspicion, justifying the officers allaying that suspicion. Yeah, that is my position, your honor, is that would not in itself give reasonable suspicion that criminal activity was a foot. OK, thank you very much. All right. We'll hear from. You're muted, I think you're going to have to hit the button. I think there you go. Thank you. Good morning, Gene Hudson for the United States. I'd like to just jump in with the point that you were making, Judge Niemeyer, at the very end of counsel's argument regarding the circumstances that have been now discussed fairly thoroughly involving the man asleep in the school parking lot. I just wanted to emphasize that in addition to those facts, the. Time of day was eight o'clock or just before eight o'clock. It was a school day and it was, as the court has noted, a parking lot where students park. Children were coming to school that day. Kids were coming to school as were teachers and staff. And they were coming fairly soon in relation to the time period of this particular event. So for all the reasons that the court has been referencing, it's clearly the government's view that where a man has been observed by a school authority in a car just before eight o'clock in the morning on a school day. In a high school parking lot with a crossbow in his vehicle asleep, unable to be awakened that those facts support the reasonable suspicion in this case for Deputy Johnson making the Terry stop that he did. In addition to that, when the officer got to the scene, Mr. Coleman drove away. And as the court has recognized, I think these facts are clear and undisputed that the officer pulled in behind Mr. Coleman's car, parked erratically with the brake lights on, engine running and really mostly in the travel lane, but turned as though he was going to pull into a place or perhaps back out of a place. But at the time the officer arrived, certainly the car was not in a parking place. Engine is running. The officer called in the license plate and as he got out of the car, Mr. Coleman started driving away. So that behavior, in addition, evasive behavior or flight, however you want to characterize it, unquestionably added to the reasonable suspicion. So, Ms. Hudson, do you think the Terry stop occurred when the deputy initially got out of his car or when he stopped the car after it had driven away and then got out for the second time? I think I would say that this stop occurred when he whooped his, for lack of a better word, his siren. He didn't turn it on to to stay on. But he when the car started to drive away, certainly there's a stop at that point. And the reason I make that distinction is that from what I can tell from both the testimony and the video, I don't think the officer actually got out of the car. It appears that the door opened and he was going to get out of the car. But Mr. Coleman started to drive away so quickly, the door shuts and I heard the siren activated at that point. So certainly at the point that the siren is activated, I think there's a Terry stop. And of course, Mr. Coleman, then I think he hit the siren twice and then Mr. Coleman pulled into the parking space and then the rest of the contact occurred. But I think when the officer simply pulled in behind him, he had not yet actually stopped the vehicle for these purposes. Certainly when the siren happened, the government's view is that there was reasonable suspicion for on multiple bases. The primary reason, as the court has has already spoken about in the argument, being concerned for the safety of the children as well. There was reasonable suspicion that Mr. Coleman was driving impaired under the influence of drugs or alcohol simply because of these circumstances. But. Counsel, let me let me interrupt you there. I mean, the did did I'm trying to remember. Did Officer Johnson. It seemed like the safety issue from being parked in the driving lane and the safety issue associated with the crossbow was the reason that Johnson articulated. Did he articulate the reason you just said about driving under the influence? I can't recall that. He said that he was concerned. At one point, he said he was concerned that there was somebody across. Sorry, but the crossbow asleep that doesn't belong in the parking lot and that he would be concerned about that. But he also said that he was the first thing that he was concerned about. This is it. J.A. 38 was everyone's safety. He said he was a school administrator and that sorry that the school administrator had contacted him regarding the subject being asleep or passed out. And then he said, I'm concerned for the driver's safety. The school safety that is the students, the staff and the faculty. So I do believe that he made reference to the state of the driver as well as the students. I don't think that he actually said the words driving impaired. He may have, but he certainly referred to the driver's safety. OK, we also take sorry. We also take the position that, as Judge Niemeyer has pointed out, the status of the crossbow under the Virginia code is irrelevant. And our view to the lead to the reasonable suspicion that exists in this case and would ask the court to affirm the district court's decision on that basis. But of course, we've responded in our brief to Mr. Bragg's argument that the crossbow was a weapon of like kind and and take that position as well. But as we pointed out in our brief, we don't think the court has to reach that decision. The crossbow was a potentially lethal weapon in this in this car, in the parking lot at this time of day, on this particular day, under the circumstances we've already described. And was, therefore, a fact that the officer absolutely rightly considered in believing that there was reasonable suspicion for the Terry stop. The district court got this right. And we'd ask the this court to affirm on all those grounds. Otherwise, I'd be happy to answer any questions from the court. Thank you, Miss Hudson. And otherwise, on our brief. Thank you, Mr. Bragg. You have some rebuttal. Thank you, Your Honor. What occurs to me is this. And I recognize and respect the concerns that several members of the panel has has expressed concerning school safety. Yeah. And it's obviously something to be taken into consideration. That's the reason I said that if the deputy had gotten there and Mr. Coleman was still asleep behind the wheel of that car, then his interaction would have been totally appropriate. But if his stopping the car was justified. For him to intervene. For the safety of the school, because there is a man with a crossbow in his car back would be considered who might have been asleep earlier. Soundly sleeping. That would have been inconsistent. With stopping the car in the parking lot. The appropriate thing to do for the safety of the school would have been to allow the car to leave the school. To follow it. To see if he drives erratically. So, so that if he, if he were under the influence of drugs or alcohol. And you follow the car and pull it over for that. If you're concerned about some violent action. Do you stop the person you're worried about. In a school parking lot, while children are young people have come children. Are arriving and interact with that person. The interaction that turned out to be very safe. And very cordial, but if you in fact are concerned about this person is there to do violence. Do you stop them from leaving and get them out in the parking lot. So, the council, it sounds like you're saying. And you may be right there were better courses of action that could have been taken for each of those concerns. That's not really our question is that our question is, is there a reasonable suspicion. And if school safety, the safety of the students and people at the school is a concern. Yeah. Okay. Maybe you let him get off campus. But yeah, it seems like you're mixing up. What's the best course of action with whether or not there's a reasonable suspicion. I understand what your honor is saying and that is not what I'm doing. I'm saying that the deputies. Actions were inconsistent with that reasonable suspicion. In other words, if he truly reasonably suspected that there might be a crime of foot. Endangering the safety of the school on potential violent action by this person in this car. He would not have stopped him and got him out of the car. Oh, I mean, the scenario is pretty easy. You say, okay, he's pulling away. And the officer does nothing. And the off and the fellow just goes around the block and comes back and shoots a few kids with the crossbow. And what's the public going to say about that officer? No, no, no. I'm not saying that. You just take the Terry facts. These three guys are walking on a public sidewalk. The officer welfare said, move along. That's none of your business. Just move along. He didn't do that. He suspected that they were planning to rob the store or break into the store. So he stopped them and frisked them. And the Supreme Court said that criminal activity was afoot because that was a reasonably suspicious conduct that was being prevented. And here we have, I think, much more serious risks at stake. We have a man with a lethal weapon on a school parking lot at the time the kids are coming to school. And with no explanation. Now, if he's conspiring to make a statement and kill some children, as we know, that's been a problem in our society in recent years. It seems to me it's a de minimis stop for a second or two to find out what's going on is all that Terry authorizes. Now, of course, we know in this case that immediately after the stop was made and he opened the door, we now move quickly into probable cause. But that's that's not before us. Yeah. And if I might just respond to her, I'm like, please do. Please do. Just to clarify, I'm not saying that he should have. He would have let him go. I'm saying he would have let him leave the premises and followed him and have observed him. One, to make sure he doesn't come back to to determine whether he could drive appropriately on the streets or his or his. And what's what's his justification for following and making sure he doesn't come back? If he were if he were truly suspicious. Well, that's my point. He was suspicious. He said he was. No, he wasn't. He said that he was. Concerned about his safety, about primarily it was a. We look at during the trial page. I thought he said he was concerned about the safety of the school and the man. He did, and then he also said during trial question, OK. Now, at the time that you stopped it, where did you have suspicion that something criminal was occurring? Answer? No, not exactly what I was stopping him. Of course, that's not necessary under Terry. Right. We agree with that. Yes. What I was stopping for is checking for his safety and making sure he'd be OK to be behind a motor vehicle and driving. Also, I wanted to get him identified. That was his answer at the trial. Well, if you want to look at a crime, a driving while impaired is another problem, isn't it? It is. And he could make a stop for suspecting somebody's driving while impaired. Yes. If he's observing driving. OK. And the final thing I just want to say is your honor has referred to this crossbow as a lethal weapon. It's one make sure this for the record. Our position is that under legal under Virginia law, technically a crossbow is not a weapon. If that's without one statute, that's for that one statute which defines a weapon. Everybody agrees a crossbow is a weapon, right? I would not under the statute. I'm talking about something that can hurt somebody and kill somebody. Yes, your honor. Yeah. I mean, I just want the record to be clear about our positions. I understand. Thank you. All right. Yes. Thank you, Mr. Bragg. You, you two were court appointed. Do I understand? That is correct, your honor. Yeah. Well, I want to thank you and recognize your assistance to the court. This, of course, is essential to make our whole system as best as we can adjust system. So thank you for your service in that regard. We would normally come down and shake hands with both of you. And thank you for your which is our tradition. And thank you for your arguments. So we do. So now we'll invite you back another time and we'll shake hands and maybe even remember this occasion. Thank you. Thank you very much. And we'll proceed on to the next case.
judges: Paul V. Niemeyer, G. Steven Agee, A. Marvin Quattlebaum Jr.